1

FILED
IN CLERKS OFFICE

2006 MAR 23  P 12: 55

U.S. DISTRICT COURT
DISTRICT OF MASS.

## UNITED STATES DISTRIC COURT
District of Massachusetts
1 courthouse way, suite 2300
Boston, Massachusetts. 02210
617-748-9152

Rashid Jahm                                    Case No:05CV11638-JLT
    Pro se                                      **Jury Trial Demanded**
    Plaintiff
Vs
Paul J. Fischer                                Mark E. Donnelly
Juliana deHaan Rice                               Pro Hac Vice
Assistant Attorney General                     Attorney for defendant
One Ashburton Place –Room 2019                 State of Michigan
Boston, MA. 02108                              P. O. Box 30736
(617) 727-2200, ext. 2062                      Lansing, MI. 48909
                                               (517) 373-6434

### Plaintiff answer to Motion of defendant's state of Michigan and Paul J. Fischer

Plaintiff brought this case in the federal court because of his violation of constitutional right
and violation of due process

Plaintiff answer to defendant eleventh amendment immunity

1: Commence and prosecuted against one of the United State by Citizen of another State
Supreme court amended and passed in ruling of Chrisholm V. Georgia, 2 U. S. 419 (1993) that
federal court have the authority to hear cases in law and equity against state, and that did not
enjoy sovereign immunity from suits made by citizen of other States. Because Plaintiff have
brought under Diversity Jurisdiction of the federal court suits against state so Eleven
Amendment will not apply here.

The 14th Amendment isn't a cause of action; the cause of action is found in 1983,
which is a statute allowing you to sue for violation of constitutional rights, including
those applied to the states through the Due Process clause of the 14th Amendment.

When a judge (Dennis Leiber) decided a case, which was a state action. He did not do it with
compliance with law so due process requirement was not met. So clearly it was a 14th
Amendment violation. He simply expanded his own power outside of the law. Simply again,
this was unconstitutional.

### Federal Jurisdiction

Plaintiff complaint of filling suits in federal court have risen in two instances by defendants violation of plaintiff constitutional right and due process which come under federal jurisdiction

1: Defendants violated plaintiff constitutional right and violated due process.

2: plaintiff claim has involved by defendant in diversity of citizenship (citizens of different state) and plaintiff suits amount is more than $75000. Under statute 28 U.S.C. § 1331. The district courts have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.
United state district court has subject matter jurisdiction to hear this plaintiff case because the parties are diverse, meaning that defendant come from different states.
3: Plaintiff has brought these suits against defendants of defendant's action that was brought under jurisdiction of subject matter that is why it is not necessary if it have personal jurisdiction
 Dennis Leiber said Police officer did not have X rays vision. Contradiction to testimony of police car. .Exhibit  (A) Page 13 to page 18.

Congress has conferred upon federal courts jurisdiction to decide *federal questions* i.e., cases or controversies arising under the Constitution and laws of the United States 28 U. S. C. § 1331 and cases or controversies between citizens of different states (*diversity jurisdiction*). 28 U. S. C. § 1332. Plaintiff is certain Venue is proper.

Exclusive jurisdiction only federal courts have authority to hear a case.

Plaintiff has requested relief in his complaint. Plaintiff alleges that defendants is liable in both his official
and individual capacities under 42 U.S.C □1983 (1994) Motion before Hon. Judge Donald A. JohnstonExhibit (B) page 3 to 66
Articles 111, 2 of the united State Constitution give the US congress the power to permit federal court to hear such cases.  Where Plaintiff has been unable to get justice and all defendants conspire to deceive, violated his constitutional right and violated his due process.

All defendants have been failing to answer plaintiff's documented proof. Instead trying to cover up their fraud by finding way without answering to allegations. Plaintiff is requesting for discovery.

Wherefore Plaintiff request to Hon. Court for all defendants to compel answer have truthfully with affidavit or simply admit the allegations instead finding way out. This court has jurisdiction on all defendants.

Dated: March 21, 2006

Rashid Jahm
Pro se

49 Hallehan Ave
Lawrence, MA 01841
978-258-9419

CC:
Document mailed by us postal to all
Patrick Dolan
John A. Christopher
Stephen J. Duggan
Juliana deHaan rice
George L. McCarger
Mark E. Donnelly (P39281) Pro Hac Vice
Robert P. Powers,
Thomas R. Meagher
Judy E. Bregman

## CERTIFICATE OF SERVICE

Dear Clerk

I hereby certify that a true copy of the foregoing document was served on all know parties herein by causing a copy of the same to be mailed, postage prepaid on March 21, 06.

Respectfully

Rashid jahm
49 Hallenan Ave
Lawrence, MA.01841
978-258-9419

Dated: 03-21-06

| | | |
|---|---|---|
| 1 | | lanes are there?  Let's take tł ⟩at would be the east |
| 2 | | part of that intersection? |
| 3 | A | The east part of it? |
| 4 | Q | Yes.  How many lanes? |
| 5 | A | There's five lanes. |
| 6 | Q | And, when you say there are five lanes -- I only see four. |
| 7 | | One, two, three -- |
| 8 | A | I'm talking about on Three Mile.  Are you talking about on |
| 9 | | Alpine? |
| 10 | Q | Yeah.  We'll get to that.  How many lanes? |
| 11 | A | Southbound on Alpine there's three lanes, one's a |
| 12 | | right-turn lane -- not three lanes.  There's three |
| 13 | | southbound lanes.  One is a right-turn lane.  There's two |
| 14 | | lanes going southbound, and then there's a left-turn lane, |
| 15 | | also. |
| 16 | Q | And in which lane was Mr. Jahm when you struck -- when your |
| 17 | | car struck his car? |
| 18 | A | He wasn't in any of the lanes.  He was in the intersection. |
| 19 | Q | That's correct.  He was in the intersection, wasn't he? |
| 20 | A | That's right. |
| 21 | Q | And you didn't have any obstacle whatsoever that prevented |
| 22 | | you from seeing his car in the intersection? |
| 23 | A | Yes, I did. |
| 24 | Q | Would you tell the jury what was in the intersection, in |
| 25 | | the intersection, that prevented you -- |

**13**

1   A   The two vehicles.

2   Q   Listen to my question please, sir.  That prevented you --

3       you said you were stopped.  That prevented you from seeing

4       the car approach?

5   A   The two vehicles that were southbound that I was stopped in

6       front of.

7   Q   Look at the chart.  Here.  Not in the intersection.

8   A   They were at the stoplight at the intersection.

9   Q   That's at the stoplight at the intersection but, as your

10      testimony just indicated, they were not in the

11      intersection, is that correct?

12  A   That's correct.

13  Q   And so had you done what I'm going to do now, just look

14      like that (indicating), there was nothing to prevent you

15      from seeing Rashid Jahm's car coming with the green light

16      traveling from the north to the south?

17  A   I didn't look like that.

18  Q   You did not look, did you?

19  A   I did look.

20  Q   Now, wait a minute.  You didn't look like that, but you

21      looked?

22  A   That is correct.

23  Q   But isn't it true -- and I'll repeat the question again.

24      Just looking at the chart -- that when you started up in

25      the intersection there was nothing that blocked you

**14**

personally       ̱eeing his car, Rashid's car, coming from
the north and going south?

A    Just those two vehicles that were parked there.

Q    And they weren't in the intersection as you can see here,
am I correct?

A    That is correct.

Q    So, if those cars were not in the intersection and you
looked to the left, would you tell the jury the reason you
didn't see Mr. Jahm's car?

A    I don't know why I didn't see his car.  I saw the
motorcycle, and I looked to the left at the time that
motorcycle was going up there, and I looked back to the
right, and both ways were clear.  I accelerated.

Q    When you accelerated, you put your foot on the throttle to
get going, right?

A    Right.  I started up, yes, sir.

Q    You did not stop at all once you struck Mr. Jahm's car?

A    No.  I only moved about five feet.

Q    You moved five feet -- I'd like to show you what is part of
collective Exhibit 4.  You moved five feet, and you smashed
in the driver's side -- excuse me, the passenger side of
Mr. Jahm's car?

A    That's the damage my car did, yes.

Q    As a matter of fact --

                (brief pause)

**15**

| | | |
|---|---|---|
| 1 | Q | As a matter of fact, your car had a smashed in -- that's my |
| 2 | | term. And what is that called? I'm showing you another |
| 3 | | picture, Exhibit 4. What is that? |
| 4 | A | Those are the push bumpers, and they were bent over in the |
| 5 | | direction that Mr. Jahm was going. |
| 6 | Q | And a push bumper is made of high strength, tensile steel, |
| 7 | | isn't that correct? |
| 8 | A | I don't know what it's made out of, sir. It's made of |
| 9 | | rubber and steel. |
| 10 | Q | Tell the jury what a push bumper is used for. |
| 11 | A | It's used to push vehicles off to the side of road so it |
| 12 | | doesn't cause damage to the police car or the vehicle |
| 13 | | you're pushing. |
| 14 | Q | And this push bumper was smashed in, wasn't it? |
| 15 | A | It was bent over, yes, sir. |
| 16 | Q | It was bent over based on your striking the passenger side |
| 17 | | of Mr. Jahm's car? |
| 18 | A | As he went by the front of my car, yes. |
| 19 | Q | When you said, as he went by the front of your car, you |
| 20 | | smacked him and didn't put the brakes on, did you? |
| 21 | A | I was starting up, and he sideswiped the front of me and we |
| 22 | | collided. |
| 23 | Q | Would you answer my question? You didn't put the brakes |
| 24 | | on, did you? |
| 25 | A | No, I didn't. |

**16**

| | | |
|---|---|---|
| 1 | Q | Is there some reason you didn't      e brakes on if you |
| 2 | | went five feet? |
| 3 | A | There was not enough time to put them on. |
| 4 | Q | Not enough time for you to avoid the accident, correct? |
| 5 | A | Yes. |
| 6 | Q | You heard Mr. Jahm's testimony, didn't you? |
| 7 | A | Yes, I did. |
| 8 | Q | And he testified -- and these are my words -- that you |
| 9 | | struck him and then struck him again. Do you remember that |
| 10 | | testimony? |
| 11 | A | Yes. |
| 12 | Q | Isn't it true that you kept going as his car was going -- |
| 13 | | I'll ask you if you know how fast he was going, but he |
| 14 | | testified 40 to 45 miles an hour. You struck his car and |
| 15 | | you kept going, didn't you? |
| 16 | A | No, I didn't. |
| 17 | Q | When did you stop? |
| 18 | A | As soon as I struck his vehicle. |
| 19 | Q | Well, your testimony is that one striking of the vehicle |
| 20 | | did all that damage? |
| 21 | A | That's correct. |
| 22 | Q | And is there some reason that you didn't stop until after |
| 23 | | you struck the vehicle -- his vehicle? |
| 24 | A | Well, I didn't put the brakes on. |
| 25 | Q | You didn't put the breaks on until you struck -- |

**17**

```
 1    A    I didn't put them on.
 2    Q    You never put them on?
 3    A    After we struck, yes.
 4    Q    Let's get this clear.  Please tell the jury, did you put
 5         the brakes on at any time?
 6    A    No.
 7    Q    Now, I'd like to show you another part of collective
 8         Exhibit 4.  Do you see that piece of metal that's lying
 9         there?
10    A    Yes, I do.
11    Q    Will you tell the jury what that is?  Do you know?
12    A    I believe it's part of Mr. Jahm's car.
13    Q    And do you know how it got there --
14    A    No, I don't.
15    Q    -- in that location?
16    A    No, I don't.
17    Q    Am I correct that that piece of metal was not moved when
18         the picture -- or prior to the pictures being taken by the
19         police?
20    A    No, you're not correct.
21    Q    Who moved it?
22    A    We don't know.  It could have been moved by vehicles
23         passing over the top of it.  That picture was taken at
24         least ten minutes after the impact.
25    Q    And did you see any vehicle passing over the top of that?
```

**18**

S T A T E   O F   M I C H I G A N

THE 17TH CIRCUIT COURT FOR THE COUNTY OF KENT

**RASHID A. JAHM,**

        Plaintiff,



vs

No. **00-08794-NI**

**CITY OF WALKER, a Michigan Municipal
Corporation and EUGENE E. KARS,**

        Defendants.

_____/

**MOTIONS**

BEFORE HONORABLE DONALD A. JOHNSTON, CIRCUIT JUDGE

Grand Rapids, Michigan - **Friday, July 26, 2002**

APPEARANCES:

For the Plaintiff:  **STEPHEN C. BRANSDORFER (P11133)**
                     **Attorney at Law**
                     **161 Ottawa Avenue, N.W.   Suite 411-S**
                     **Grand Rapids, Michigan 49503**
                     **(616) 774-8422**

For the Defendant:  **CRAIG R. NOLAND (P30717)**
                     **Smith, Haughey, Rice & Roegge**
                     **200 Calder Plaza Building**
                     **250 Monroe Avenue, N.W.**
                     **Grand Rapids, Michigan 49503**
                     **(616) 774-8000**

RECORDED and
TRANSCRIBED BY:     Sylvia A. Stratton, CER 4143
                  Certified Electronic Recorder
                  (616) 632-5031

1    Grand Rapids, Michigan

2    Friday, July 26, 2002 at 3:02 p.m.

3    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

4    THE COURT:  Good afternoon, everybody.  We are

5    convened in *Jahm* -- that's JAHM -- versus *City of Walker and*

6    *Eugene E. Kars*, file 00-08794-NI.  Trial is currently

7    scheduled for August 19th.  And there are some motions in

8    limine, as near as I can tell, principally pertaining to

9    proposed video tapes and photographs relative to, I think, a

10   squad car showing lights or something and causing a certain

11   amount of angst.  And there may be some other issues, too,

12   but that seems to be the principal one.

13   Gentlemen, I'm at your disposal.

14   MR. NOLAND:  Your Honor  --

15   THE COURT:  Mr. Noland.

16   MR NOLAND:  -- Your Honor, the motion in limine that

17   was originally scheduled for hearing today was defendant's

18   motion in limine that was filed on June 13, 2002.  I don't

19   know if that motion caught your attention.

20   THE COURT:  Well, I don't know if it did or not.  I

21   mean, one of the problems is that, when we get six

22   succeeding motions, some of them wind up in the file and

23   some of them wind up on my desk.  And most of the smoke that

24   I see here is with videos and photographs.  I've got all

25   kinds of stuff on that.

3

1           There's also some collateral reference about lost

2      wages that I didn't completely understand.  And then there

3      was something else about the practice of emergency calls or

4      something, and I didn't completely understand that, either.

5      But certainly, I'm in a position to entertain whatever it is

6      that anybody wants to bring up at this point.

7           MR NOLAND:  All right.  Your Honor, on June 13 --

8      I represent defendants Eugene Kars and the City of Walker --

9      we filed --

10          THE COURT:  I've noticed that before.

11          MR NOLAND:  -- I have filed a motion in limine

12     with a brief on June 13th, and it has to do with some

13     related subject matter.  But specifically, a motion in

14     limine asking this Court not to allow plaintiff to present a

15     claim or suggest a claim or argument that the emergency call

16     procedure of the City of Walker was improper or deficient or

17     provide criticisms about it.

18          THE COURT:  Yeah.  That was one of the points I

19     see referenced here.  Now, what's the problem with that?

20          MR NOLAND:  Well, the problem with that, Your

21     Honor, and it gets to some other elements of the motion in

22     limine --

23          THE COURT:  I mean, is there something wrong with

24     the procedure or isn't there?  And, if there's an argument

25     about it, why don't we just litigate it?

4

1       MR NOLAND:  Well, Your Honor, because there's a

2   governmental immunity in Michigan.  And the only claim that

3   survived governmental immunity to the City of Walker is

4   negligent operation of a motor vehicle.  And that -- that

5   exception has been construed very narrowly by the Michigan

6   Supreme Court and as other exceptions to governmental

7   immunity are construed very narrowly.

8       That it is our position that, to allow the case to

9   proceed with putting the City of Walker's emergency

10  procedures on trial, is obviously a back door -- it will

11  have the effect of a back door claim of negligence against

12  the city or a tort claim against the city.

13      And the best example I could give of that argument

14  is an analogy to the recent Michigan Supreme Court decision

15  in *Robinson* versus *City of Detroit* where, again, that case

16  generally arose from -- well, actually it's some

17  consolidated cases -- but they were motor vehicle cases.

18  They happened to deal with fleeing felons and the court

19  wrestled with a bunch of issues.

20      THE COURT:  That's been a hot issue for 20 years

21  or more.

22      MR NOLAND:  Right.  But one of the -- one of the

23  points addressed by the majority of the court was: is the

24  decision to initiate pursuit or not fall within the scope of

25  the, quote/unquote, "negligent operation" exception to

5

1    operation of a motor vehicle.

2              And I thought the only -- and I will point out

3    that there is no specific claim or contention or pleading

4    that says that the city was, quote/unquote, "negligent" in

5    its formulation or implementation.

6              THE COURT:  Well, presumably because it's covered

7    by immunity.

8              MR NOLAND:  Yes.  But my point is obviously it

9    could not be pled to begin with, but why an order in limine

10   is necessary is, if I do not ask the Court to take account

11   of that limited immunity in terms of arguments presented to

12   the jury in proofs, then we have really run the problem of

13   back dooring some claim of negligence because they'll come

14   in and say, "Well, geez, as their expert has claimed, you

15   know, their policy is no good.  It doesn't give guidance.

16   It's not worth the paper it's written on."

17             And, you know, if we get into a trial situation

18   and I now have to bring up witnesses that say, "No, you

19   know, this is the same policy used by this city or that

20   city.  There's public policy reasons for it."

21             If we get into issues of that nature, well, that

22   might be interesting and maybe it's a good point of public

23   policy debate, but it does not and, I think, should not be

24   part of a case where we are talking about a limited

25   exception to governmental immunity; that is negligent

                              7

1     these circumstances truly back doors a claim of negligence.

2     And whether we like it or not, that is a -- that -- and

3     whether we call it a negligent claim or not, in effect, what

4     we're doing is lumping on the city. We are asserting a

5     theory that is within the realm of tort.

6          THE COURT:  Well, I understand what you're saying.

7     But all I'm saying is that I means, I presume, the city will

8     not attempt to defend the action by saying that the officer

9     acted according to procedures.

10         MR NOLAND:  I think the city will defend the

11    action by saying that he complied with the motor vehicle

12    code provisions that are applicable to emergency responses.

13         THE COURT:  Ok.

14         MR NOLAND:  The -- the --

15         THE COURT:  In other words, the procedure just

16    won't come up at all?

17         MR NOLAND:  That's -- that's what I believe is the

18    case.  And -- and related to that, and this segues into the

19    second -- it's not an independent argument but I think it

20    applies what we just discussed in perhaps a little more of

21    an evidentiary context.

22         Plaintiff has retained a gentleman by the name of

23    Dennis Payne who has background and experience working for

24    various police agencies.  He's not -- and I believe the

25    record is very clear -- he's not undertaken an investigation

9

1          MR NOLAND: Well, Judge --

2          THE COURT: That's the standard. I mean, that's

3    the --

4          MR NOLAND: -- and the request for admissions --

5    they filed request for admissions -- isn't it -- don't you

6    need to do this or that, you know, keep the safety of the

7    community in mind and large? That's fine.

8          THE COURT: But they do. I mean, I --

9          MR NOLAND: But --

10         THE COURT: -- guess I -- that seems to be quite

11   unremarkable to me. I'm having a hard time comprehending

12   why that's a problem.

13         MR NOLAND: -- and I -- I'll try to connect the

14   dot here. My point, Your Honor, is that whatever the

15   standard of care or duty is is well expressed in the

16   statute. And the statute talks about an emergency vehicle

17   may proceed through a red light. If they proceed, they slow

18   down and exercise the due care. And all I'm asking is, if

19   we're going to have the jury consider this case, let's stick

20   precisely to the requirements of the statute, the motor

21   vehicle code.

22         Because there is some different phraseology and

23   wording. And again, the way this --

24         THE COURT: Well, what words do you want to use?

25   You don't want to use "care." You want to use?

12

1           MR NOLAND:  I want to use the statute.

2           THE COURT:  What -- give me the words.

3           MR NOLAND:  All right.

4           THE COURT:  And what -- and those are -- I mean,

5    is there something that's different about the statute than

6    the standard?

7           MR NOLAND:  Yeah.

8           THE COURT:  I guess that's -- I'm having a hard

9    time because it seems to me they've got to exercise due

10   care.  And I would --

11          MR NOLAND:  Well --

12          THE COURT:  -- if that's the policy, that's the

13   policy.

14          MR NOLAND:  -- sure.  And the courts can instruct

15   the jury that both parties have to exercise ordinary care.

16          THE COURT:  Exactly.  So, I mean, I guess this

17   seems to me to be a tempest in a teapot.

18          MR NOLAND:  Well, Your Honor, I --

19          THE COURT:  I guess I don't get the problem.

20          MR NOLAND:  -- I had illustrated our motion with

21   briefs -- with the brief -- and it showed specific context.

22   And I don't want to --

23          THE COURT:  Okay.  I've got it here.  It's very

24   deep in the file.  It's about eight briefs ago.  That's the

25   problem.

13

1        MR NOLAND:  Judge, I feel very --

2        THE COURT:  And I guess there may be a difference

3    there, although --

4        MR NOLAND:  -- I guess, Your Honor, I'd feel

5    comfortable -- and one reason we bring these motions in

6    limine is that maybe I'm being -- flyspecking an issue and

7    maybe it's not important.  But I'd rather bring it to the

8    Court's attention and have it there --

9        THE COURT:  Well, I think it's a good idea.  If

10   we're going to not use the procedure per se, we probably

11   ought to sort that out now.  I agree with you.  I think that

12   makes sense.

13       MR NOLAND:  The other two aspects of the motion in

14   limine -- one is minor -- was that I don't believe the jury

15   -- well, the most important part of it is is that this

16   expert that they retained, this Dennis Payne, the only

17   testimony that he provided had to do with the policy and

18   procedures and why he thought they were not appropriate.  He

19   did not offer anything relative to this case in terms of

20   accident reconstruction or things of that nature.

21       And I truly believe, Your Honor, if you happen to

22   agree with my positions on the idea that you cannot -- we're

23   not putting on trial the City of Walker's procedures, then

24   there's really nothing left of Mr. Payne in terms of what

25   he's going to offer the jury.

16

1          And I think that -- one kind of follows the other.

2      And that's -- that's the point I'm trying to make.

3          THE COURT:  Okay.  Well, all right.  Let's see

4      what Mr. Bransdorfer has to say about this.  Mr.

5      Bransdorfer, any reason why we shouldn't use the statute

6      here and go with the language which seems to be virtually

7      identical in any case.

8          MR. BRANSDORFER:  Your Honor, the answer to your

9      question is we are not trying, nor is Dr. Payne, in any way

10      trying to change the wording of the statute as being the

11      standard of care.

12          THE COURT:  Well then, I guess we're probably in

13      pretty good shape here.

14          MR. BRANSDORFER:  But, if you read -- and this is

15      why I think it's important -- if you read, Your Honor, the

16      motion in limine as to Dr. Payne, there were four different

17      aspects of that motion.  And, in summary, they wanted barred

18      from in any way reference to the City of Walker's call for

19      service procedure.

20          Well, it doesn't use any language, so far as I can

21      tell, but the statutory language.

22          THE COURT:  Well, it's not exactly the same,

23      although it looks to me to be pretty close.

24          MR. BRANSDORFER:  And the second thing is what --

25      what they refer to as suggesting a more stringent duty or

17

1       standard of care. And that is not what plaintiffs intend by

2       any means to do, and that is not what Dr. Payne testified in

3       his deposition or in the exhibits that he prepared that were

4       attached to his deposition.

5               And then there's another aspect of this that

6       apparently has been withdrawn by counsel because he didn't

7       mention it. And that is that the emergency alarm that was

8       being responded to by Officer Kars when he struck the

9       plaintiff's car in the intersection, was, in fact, a false

10      alarm. And --

11              MR NOLAND: I'm not withdrawing that. I don't

12      think that's relevant one way or the other.

13              THE COURT: I guess I'm not sure that it is

14      either, unless Officer Kars knows it's a false alarm, in

15      which case presumably his response to it would be different

16      than if he assumes it's legitimate.

17              MR. BRANSDORFER: That is the point. He's had a

18      number of --

19              THE COURT: In other words, he knows this is a

20      false alarm?

21              MR. BRANSDORFER: No, no. I'm not saying he did.

22      I'm saying that the testimony indicates that there had been

23      a number of false alarms that he has responded to to this

24      very location, the Keller Ford location.

25              And his testimony is he couldn't remember how

                                    18

1       And what we're saying, Your Honor, is that this is

2   just part of this factual picture.  It's not a separate

3   cause of action.  These jurors are not police.  They need

4   someone that is qualified and he is immensity qualified to

5   discuss police procedures.  The testimony that he would give

6   are as to police procedures that we're talking about; what's

7   known; what, in terms of at the scene, due care in terms of

8   the context of the facts.  That's admissible.  It's

9   relevant.

10      And, as I mentioned in our brief, the Supreme

11  Court has said, in *People* versus *Miller* -- this is, Your

12  Honor, located at 33 Michigan App 279.  It's a 1971 case. --

13  and it -- the court said, in terms of an argument similar to

14  what has been made by counsel, that the following is the

15  holding:

16              "An expert witness with peculiar knowledge

17          and special experience which ordinary jurymen do

18          not have, may testify as to opinions and

19          conclusions," citing the AG case, "The conclusion

20          of an expert witness is properly received into

21          evidence when the conclusion to be drawn from the

22          facts depends on professional or scientific skill

23          or knowledge."

24      And the statute uses the term "negligence" and

25  "gross negligence," but it refers to, among other

22

1    emergency vehicle?  Yeah.  A police car.  A police officer.

2              Is he responding to an emergency call?  I think

3    so, although I guess it's open to question here.

4              And then, the next thing we go on to subsection

5    three:

6                   "The driver of an authorized emergency

7              vehicle may do the following -"

8    and sub B is:

9                   "proceed past a red or stop signal or stop

10             sign, but only after slowing down as may be

11             necessary for safe operation."

12             So, if we assume this is a police vehicle operated

13   by a police officer and if we assume he's on an emergency

14   call, then the only question is did he slow down or do

15   what's necessary for safe operation before proceeding past

16   the red stop signal or stop light.

17             And that, I think, is the whole case, isn't it

18   probably?  I mean, aren't we all right in that little

19   paragraph of 603, sub 3, sub B?

20             MR. BRANSDORFER:  Your Honor, yes.  And we have

21   cited -- there are other related statutes.  But -- but

22   here's what the Robinson case said -- it's at page 10 of our

23   brief, and that was a chase case --

24             THE COURT:  Right.  I understand that that was a

25   chase case and this is an emergency call case not involving

                                24

1          an emergency vehicle with flashing lights,

2          specifically states that the statute does not

3          relieve the driver of an authorized emergency

4          vehicle from the duty to drive with due regard for

5          the safety of persons using the highway."

6          In short, Your Honor, we don't think that the

7    motion in limine is well grounded at all; that Dr.  Payne

8    should be permitted to testify from his standpoint as to

9    these procedures; what the proper procedure was.  He is not

10   an accident reconstruction person but he certainly has been

11   at the scene.  He's fully familiar with the facts and has

12   read the provisions that are in the Walker Police Department

13   files.

14         And we think that the jury requires the assistance

15   of an expert in police procedures, and that Dr.  Payne

16   should accordingly be permitted to testify as to those

17   relevant issues.  And we would request respectfully that the

18   motion in limine as to this matter be denied.

19         THE COURT:  All right.  Well, Mr.  Noland,

20   anything else you want to say about Dr.  Payne?

21         MR NOLAND:  Yes.  I believe a lot of what Mr.

22   Bransdorfer says actually supports our motion; that he

23   recited some of the testimony concerning the percentage of

24   alarms that are false.  And, I take it, from his comments,

25   he wants to now have Mr.  Payne serve as an expert.

27

1            And I asked myself what's an expert going to
2   opinionate about, and --

3            THE COURT:  I don't know.  I assume you guys
4   figured that out during discovery.

5            MR NOLAND:  -- well, and the only thing that he's
6   opinionating about is that the procedure is deficient.

7            And the only thing logically that he would offer,
8   as far as expert opinion, is a criticism that, "Somehow,
9   well, you're getting too many false alarms.  That's not the
10  way to operate."

11           And then I get back to my point, "Hey, there may
12  be room for honest debate and public policies as to whether
13  or not the procedure is too liberal in terms of, you know,
14  we respond to these things in emergency fashion.  But that
15  -- but to have Mr. Payne talk about those statistics and
16  only -- and will only be done in the context of being
17  critical of the formulation and implementation of that
18  policy.

19           So I think that there is nothing that he's going
20  to offer that would do -- that would apply, other than a
21  criticism of the policy and procedure.  And that's -- that's
22  what he will opinionate about and, if he's an expert and if,
23  for some reason, we need an expert as Mr. Bransdorfer says,
24  that's what his expert opinion is going to be.  And that's
25  why we think it's not proper to allow him in to testify

28

1           down as may be necessary for safe operation."

2           Unquote.

3       And that's really what we're talking about here.

4           The City of Walker apparently has a procedure for

5       responding to calls which seems to be pretty much consistent

6       with the statute, indicating that the officer must keep the

7       safety of the community at large in mind, which I think is

8       tantamount to the language, "but only after slowing down as

9       may be necessary for safe operation."

10          And I suppose there may be some subtlety of

11      distinction in the language but, although different words

12      are used, it seems to me the same import is generated.

13          I would agree that, because of municipal immunity,

14      the policy of the City of Walker is not the issue here.  It

15      is the operation of the vehicle by Officer Kars at the time

16      he received the emergency call.

17          Now, if Dr. Payne can offer us opinion testimony

18      concerning whether what Officer Kars did at the scene was

19      consistent with the statute, then I think probably we can

20      hear from him.  If he can offer us some insights about

21      whether Officer Kars slowed down as was necessary for safe

22      operation or not, then he ought to be able to tell us about

23      it.

24          I don't think Dr. Payne criticism's of the Walker

25      policy is pertinent to anything because the policy itself is

                                30

1    whether Officer Kars slowed down as was necessary for safe

2    operation in running the red light on the date that the

3    accident occurred.

4              Beyond that, I'm not sure there's a whole lot we

5    can do with it.

6              MR NOLAND:  Your Honor --

7              THE COURT:  Okay.  What else have we got?

8              MR NOLAND:  -- the other motion in limine, I

9    think, is not very significant in the sense that it was a

10   motion because plaintiffs has pled a claim of lost wages,

11   and specifically pled a loss of earning capacity.  They've

12   obtained --

13             THE COURT:  I think that's been clarified in the

14   submissions that I read --

15             MR NOLAND:  Right.  It looks as if --

16             THE COURT:  It looks like we're -- if -- and we'll

17   let Mr. Bransdorfer speak for himself -- but I think he's

18   saying that lost earning capacity is not an issue but wage

19   loss is.

20             MR. BRANSDORFER:  That is correct, Your Honor.

21             THE COURT:  Okay.  I thought that was what you

22   said but I'm glad that I didn't mischaracterize it.

23             MR NOLAND:  Yeah.  And part of what inspired the

24   motion is that we had some report from Marvin Devries that

25   had different scenarios, one scenario being the possibility

33

1       consulted with a number of doctors, just as doctors that

2       have been called -- or have been named by the defendants

3       have consulted with other doctors.  So --

4                  THE COURT:  I think that's a good way to go, and

5       we'll just kind of play it by ear.  And I'm prepared to go

6       in different directions as the circumstances seem to

7       warrant.  And I said the options that come to mind are

8       basically these: we don't allow anybody else to be added; or

9       we do allow somebody to be added; or we do allow somebody to

10      be added and we continue the case in order to prepare for

11      some new contingency.  There may be some other

12      possibilities, but I'm willing to consider those three as

13      openers.

14                 Well, what else have we to talk about, gentlemen?

15      There's some other issues we need to talk about today?

16                 MR. BRANSDORFER:  Yes.

17                 THE COURT:  Mr. Bransdorfer?

18                 MR. BRANSDORFER:  May it please the Court, we

19      filed a motion in limine, and this goes back to what the

20      Court was referring to --

21                 THE COURT:  This is this business about

22      photographs and videos and things?

23                 MR. BRANSDORFER:  Yes.

24                 THE COURT:  Okay.

25                 MR. BRANSDORFER:  That's -- that's what --

                                   48

1       THE COURT: Now, they want to put in some videos
2   of the squad car with the lights on or something like that?

3       MR. BRANSDORFER: Lights on and siren blowing, and
4   it looks like the police car -- at least to me. It's a very
5   short video. -- is in some parking lot. And it's certainly
6   not in the intersection.

7       THE COURT: They probably didn't run around town
8   with it in order to avoid creating another incident.

9       MR. BRANSDORFER: Well, the problem is, in my
10  judgment, is to mislead the -- the jury because the -- the
11  video of the police car is taken with the police car quite a
12  ways in the distance and then somebody apparently walking up
13  with a video camera and the audio on.

14      And obviously, the closer you get the more obvious
15  should be the siren, as well as the search light or the --
16  the lights. And it just seemed to me that there isn't a
17  foundation that can be laid that this is a fair and accurate
18  representation of -- now, I'm talking about that video of
19  the car, the police car -- a fair and accurate
20  representation of what took place at the time it hit that
21  car, the car hit Mr. Jahm's car.

22      Now, in addition, there's another video that just
23  was recently supplied. And it is together with some
24  pictures, and I made copies, black and white copies.

25      THE COURT: Yeah. I think I saw them someplace.

49

1       MR. BRANSDORFER:  Well, what they represent, and
2   our motion covers that, what they represent are what is
3   referenced to as an exemplar car, whatever that means;
4   exemplar vehicle.
5       THE COURT:  Well, it looks like a car that took
6   some hits.
7       MR. BRANSDORFER:  Well, it's a car --
8       THE COURT:  It's apparently a LeSabre.  I can see
9   that.  That's what, a Buick?
10      MR NOLAND:  A Buick, 1986, blue, two door.
11      THE COURT:  Okay.  And it looks like it's seen
12  better days.
13      MR. BRANSDORFER:  Yeah.  And it's represented to
14  be the car or typical -- an exemplar car, whatever that --
15      THE COURT:  So it's not the plaintiff's car but
16  it's another car like plaintiff's car.
17      MR. BRANSDORFER:  That's what they're saying.
18      THE COURT:  Okay.
19      MR. BRANSDORFER:  And they could have -- they
20  being the police department -- they had a photographer there
21  -- they could have done all of this at the time of the
22  collision.
23      There were pictures taken.  They were produced on
24  discovery.  There's -- here's the actual car, Your Honor.  I
25  have pictures of it back then.

50

1    mirror that is up front; whether or not he hit -- whether he

2    hit to roof or whether he didn't hit anything.

3             And to use this car that purports to be the

4    identical model and with the identical shoulder harness,

5    identical -- whatever the other one had -- and --

6             THE COURT:  Well, is the issue what equipment the

7    car had?  I'm a little at loss as to what we're doing here.

8             MR. BRANSDORFER:  Yeah.  I am at a loss, too, as

9    to the exemplar car because --

10            THE COURT:  I mean, if there was some question as

11   to what the plaintiff's car had in it and we know the exact

12   make and model, and we now have another one, we'd say,

13   "Well, it has this and that and --" for instance, shoulder

14   harnesses and I assume there's data available from General

15   Motors or somebody to tell us whether these make and model

16   cars had shoulder harnesses, if that's the issue.  I'm not

17   sure I understand what the issue is.

18            MR. BRANSDORFER:  Well, that's why I brought this

19   up, Your Honor.  It apparently is an attempt by the defense

20   to use this person, Gary McDonald, to testify this is what

21   was his situation at the time of the collision and that,

22   when he was struck by the police car, he could not have hit

23   anything.  That's what I think they're trying to say.  And

24   that this is a reproduction of what the situation was at the

25   time.

                              52

And we're bringing it to the Court because we think the videos, as I mentioned, do not either properly have a foundation laid or can't have a foundation laid to represent what -- what Mr. Jahm saw or heard at the time at this intersection because the car -- the police car was obviously in the intersection and moved in and struck him as he was moving with the green light. And so, we think that is not a proper reproduction of what Mr. Jahm saw.

And, as to the interior of the car, to have somebody testify as to what he, Mr. Jahm, could have hit or not hit when he's a little guy, and where his seat was in terms of the driver's seat over towards the wheel or what position back from the wheel where he was actually seated cannot be reproduced because that simply isn't known.

He got struck and was confused; did the best he can. And we just wanted to bring this before the Court's attention so that there isn't any -- any misunderstanding as to this exemplar car and Mr. McDonald's use of it through a video, through his testimony, or through pictures saying this is the precise way that it happened and he couldn't have been injured period. That's why we brought this up.

THE COURT: Well, okay, I think. I suppose probably the possibility of the plaintiff hitting this, that, or the other thing would depend on a whole lot of variables. In any event, go ahead, Mr. Noland. What can

1    you tell us about all these things?

2              MR NOLAND:  I'll break it down into the two

3    categories, Your Honor.

4              The one having to do with police siren.  It is

5    true that what we have is a video prepared by Gary McDonald

6    that shows the Walker police vehicle with lights activated

7    and siren as positioned in the municipal parking lot.  It

8    drew the attention of all the workers around.  "What's

9    happening?  What's going on?"

10             THE COURT:  Well, I suppose, if you put a car on

11   the lot and set off sirens and stuff, people are going to

12   think there's an air raid.

13             MR NOLAND:  I don't think it's fair to say that

14   we, by any means, have tried to mislead anybody to suggest

15   that we're reconstructing the accident.  I mean, I think we

16   might get into some problems if we position the car in the

17   intersection and we tried to place -- you know, if we were

18   suggesting to the jury that this is a recreation of the

19   accident, then the Court, you know, should be real concerned

20   about the details.  And --

21             THE COURT:  Well, yeah.  I assume it's not an

22   accident reconstruction.

23             MR NOLAND:  No.  What -- what I think is

24   important, Your Honor, to consider, and Mr. Bransdorfer made

25   the point that, "Well, this police vehicle doesn't show what

54

1    car.

2                  MR. BRANSDORFER:  An exemplar car.

3                  THE COURT:  It would be quite remarkable if it

4    were the same car.

5                  MR. BRANSDORFER:  Well, if you look at the

6    pictures, it looks like it is from a salvage yard.

7                  THE COURT:  Well, it looks like it's seen better

8    days, I agree.

9                  MR NOLAND:  Not a lot of '86 LeSabre on the road.

10                 MR. BRANSDORFER:  Yeah, but this one is not the

11   one you're using -- want to use.

12                 And further, this accident occurred -- collision

13   occurred in 1999.  And my recollection is the car is a 1983?

14                 MR NOLAND:  '86.

15                 MR. BRANSDORFER:  '86.  Thirteen years old at the

16   time.  So now, three years old later, it's sixteen years

17   old, if I've got -- and all I'm saying is, Your Honor, that

18   the rules are, I think, the rules of evidence are quite

19   clear that, in order for this kind of testimony to be

20   admissible, there's got to be foundation that is laid -- and

21   we've cited authority -- that it's going to assist the jury

22   and not mislead the jury.

23                 And that's why we brought this motion, and we just

24   don't think that this kind of testimony should be permitted

25   by the Court based on lack of foundation that I've tried to

                                    66